***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence. The Full Commission adopts the Opinion and Award of Deputy Commissioner DeLuca with modifications.
 *********** EVIDENTIARY RULING
On March 12, 2009, defendants filed a motion with the Full Commission to submit additional evidence and one MRI report to be submitted by plaintiff. Defendants' motion is hereby ALLOWED.
 *********** *Page 2 
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. On September 25, 2006, at approximately 10:00 p.m., plaintiff sustained a compensable injury by accident to his lower back during the regular course and scope of his employment with defendant-employer.
2. At the time of the injury which is the subject of this claim, the employer-employee relationship existed between plaintiff and defendant-employer, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. ACE USA is the servicing agent, with Interstate Brands Corporation being a self-insured entity.
4. At the time of plaintiff's compensable injury his average weekly wage was $533.72 and his resulting workers' compensation rate was $355.83.
5. Plaintiff worked as a shipping clerk for defendant-employer from August 6, 2005, through October 2, 2006.
6. The parties stipulated the following documentary evidence:
 • Stipulated Exhibit 1: Form 18
 • Stipulated Exhibit 2: Form 61
 • Stipulated Exhibit 3: Form 33
 • Stipulated Exhibit 4: Form 33R
 • Stipulated Exhibit 5: Medical Records
 • Stipulated Exhibit 6: Pay Stubs from Kelly Temporary Services
 • Stipulated Exhibit 7: Employee's Statement of Injury or Illness *Page 3 
 • Stipulated Exhibit 8: Collective Bargaining Agreement
 • Stipulated Exhibit 9: Shipping Clerk Job Description
 • Stipulated Exhibit 10: Plant Policies and Work Force Rules
 • Stipulated Exhibit 11: Employee's Earnings Summary at Kelly Temporary Services
 • Stipulated Exhibit 12: Defendants' Discovery Responses
 • Stipulated Exhibit 13: Plaintiff's Discovery Responses
 • Stipulated Exhibit 14: Pre-Trial Agreement
7. Plaintiff's Motion to Compel Response to Interrogatories and Request for Production of Documents, defendants' reply, and plaintiff's response, filed with the Commission, are made a part of this record.
8. Defendants offered into evidence the following documentary evidence:
 • Defendants' Exhibit 1: Employment File
 • Defendants' Exhibit 2: Drug Test Results
9. After the close of the record, on plaintiff's motion, the deputy commissioner re-opened the record to admit Plaintiff's exhibit 1, and additional medical record from Dr. Baule.
10. On September 24, 2007, defendants agreed to provide medical compensation for plaintiff's lower back injury pursuant to N.C. Gen. Stat. § 97-25.
11. The issues stipulated by the parties for determination before the deputy commissoner are:
 a. Whether plaintiff sustained a compensable injury to his neck at the time of the compensable lower back injury on September 25, 2006? *Page 4 
 b. Whether plaintiff is entitled to receive medical treatment with Dr. Raymond Baule?
 c. Whether plaintiff is entitled to additional compensation?
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was 47 years old at the time of the hearing before the deputy commissoner. He completed the tenth grade and obtained his GED. Plaintiff's work history consists of jobs requiring heavy lifting, including working as an upholsterer and forklift operator.
2. Plaintiff was involved in a motor vehicle accident in December 2002 and suffered neck pain that resolved in about one week following the accident.
3. On August 6, 2005, plaintiff was hired by defendant-employer. Shortly thereafter, plaintiff received training and began working as a shipping clerk. His job duties included arranging orders, loading and unloading trucks, operating dollies, cleaning his work area, and filling out an inventory book. The physical requirements of plaintiff's job included lifting, pushing, and pulling up to fifty pounds.
4. Immediately prior to September 25, 2006, plaintiff did not have any back, neck, or right arm pain.
5. On September 25, 2006, at approximately 10:00 p.m., plaintiff sustained a compensable injury by accident during the regular course and scope of his employment with defendant-employer. Plaintiff was pushing a loaded dolly when he fell and hit the lower right *Page 5 
side of his back on the lower rail of a trailer. Plaintiff experienced immediate pain in his lower back. Upon impact, Plaintiff twisted and felt a pain shoot down his right arm.
6. Plaintiff's injury occurred as he was completing his shift. Plaintiff reported the lower back injury to his supervisor, Sam Gillis, and went home. That evening, plaintiff soaked in hot water and Epsom salt and took Ibuprofen for his back pain.
7. Plaintiff returned to work on September 26, 2006. He wore a back brace to work and only worked for eight hours. That evening, plaintiff soaked in hot water again.
8. Plaintiff was scheduled to work on September 27, 2006. When he woke up that morning, his back pain had worsened and he took more Ibuprofen. Prior to the start of his work shift, plaintiff went to the emergency room at Nash Hospitals were he reported the following history:
 [He] was at work two days ago and was unloading merchandise off of a truck using a dolly when the [right] foot caught on the dolly and he fell backwards onto a 4x4 piece of wood that was lying on the bed of the truck. He was able to get up and ambulate afterwards. Yesterday he went to work using a back brace and the pain improved as the day went on but this morning he was worse with [right] back pain, radiating down the whole [right] leg.
Physical examination revealed paraspinal tenderness in the right lower back area. Dr. Susan Keen ordered an x-ray of the lumbar spine, which revealed degenerative disc changes at T10-T11, T11-T12, and T12-L1 levels associated with marginal osteophytes and vertebral end plate sclerosis. A prominent osteophyte was also visible along the left anterolateral aspect of the L3 vertebral body. Dr. Keen diagnosed plaintiff with a lumbar back strain. Plaintiff was given an injection of Toprol as well as a prescription for Percocet, Flexeril, and Motrin. Dr. Keen ordered plaintiff out of work for two days, placed him on work restrictions of no heavy lifting for seven days, and ordered him to follow up with his family physician. *Page 6 
9. Plaintiff left the emergency room and went to work, where he provided defendant-employer with a copy of Dr. Keen's work restrictions. He was told to report to Nash Urgent Care for drug testing and to schedule an appointment with defendant-employer's physician at Nash Urgent Care. It is defendant-employer's policy to perform a drug test following an injury on the day of the injury.
10. Plaintiff did not work on September 27, 2006, and he was not paid for working that day.
11. On September 27, 2006, plaintiff was required to submit a urine sample for a drug test. Plaintiff reported to Nash Urgent Care at approximately 4:30 p.m. and completed the required drug test.
12. On September 28, 2006, plaintiff saw defendant-employer's physician, Dr. Mullins, at Nash Urgent Care as instructed. The review indicated no change in symptoms from the September 27, 2006 visit in the emergency room. Plaintiff was diagnosed with low back pain and a contusion. Dr. Mullins prescribed Percocet, Flexeril and Motrin. Dr. Mullins also ordered plaintiff out of work for one day, to return on September 29, 2006, and placed plaintiff on light duty work restrictions for seven days of no lifting more than ten pounds and no bending or twisting.
13. Plaintiff returned to work on September 29, 2006. Defendant-employer accommodated plaintiff's light duty work restrictions. Plaintiff was assigned to a sit down job involving adjusting load sheets. Plaintiff performed the same job on October 1, 2006 and October 2, 2006. *Page 7 
14. It is defendant-employer's policy to provide light duty work for employees with work-related injuries. Light duty work is not available for employees with denied workers' compensation claims or non-work related injuries.
15. On October 2, 2006, plaintiff learned that his September 27, 2006 drug test was positive for marijuana and cocaine. Plaintiff was immediately suspended from his employment because of the positive drug test.
16. Plaintiff claimed that he did not use any drugs on September 25, 2006, and he was not under the influence of any drugs that day. Plaintiff pled the Fifth Amendment in response to questions regarding drug use on other dates.
17. According to two of plaintiff's coworkers, Tiffany Howington and Samuel Gillis, plaintiff did not appear to be under the influence of drugs on September 25, 2006 or while he was working on any other day.
18. After being notified of his suspension, plaintiff spoke with defendant-employer's human resources manager, Katherine Calt, about returning to his job. Plaintiff also had a meeting with defendant-employer staff, during which he pointed out provisions in the Collective Bargaining Agreement between IBC and the Bakery, Confectionary, Tobacco Workers, and Grain Millers International Union (BCTGM). He also requested drug counseling and reinstatement. Plaintiff was advised that defendant-employer would get back with him.
19. Plaintiff was later terminated because of his positive drug test. Plaintiff was not offered the opportunity to participate in a rehabilitation or drug counseling program.
20. Defendant-employer's drug-free workplace program states that
 [e]mployees who engage in the unlawful manufacture, distribution, dispensing, possession, or use of controlled substances (drugs) in any IBC workplace will be subject to one or more of the following: (A) Criminal prosecution and possible incarceration based on *Page 8 
federal and state statutes. (B) Disciplinary action up to and including discharge. (C) Satisfactory completion of an acceptable drug abuse assistance or rehabilitation program. (D) Random drug testing.
21. Defendant-employer's plant policies and work force rules state that "[a]ny Company employee who violates the following Company rules will be subject to discharge . . . b. Drinking and/or being under the influence of alcoholic beverages and/or narcotics of any class while on duty."
22. The Substance Abuse Policy contained in the Collective Bargaining Agreement states that "[t]he sale, use or possession of illegal substance is prohibited. Violation of the rules shall result in termination." The Collective Bargaining Agreement also includes a provision for involuntary recognition of substance abuse/dependence in which "[e]mployees who refuse to confront their alcohol/drug dependency/abuse problems will be subject to the following terms which differ from those outlined above." The Agreement further indicates that
 the experience of alcohol or drug problems is not, of itself, grounds for adverse action. Employees will be strongly encouraged to seek and receive the services of the employee rehabilitation program outlined herein prior to such problems affecting job performance or resulting in on the job accidents. Individuals who voluntarily seek assistance for substance abuse/chemical dependence (either directly or through a third party) will be eligible for the program established by the Company.
23. Under the substance abuse policy of the Collective Bargaining Agreement if an employee tests positive on a drug test, that employee can request to go through the drug rehabilitation program. If the employee makes this request, defendant-employer is obligated to send the employee to the program, and the employee is allowed to return to work following successful completion of the program. Terminating an employee under these circumstances would be a breach of the Collective Bargaining Agreement. *Page 9 
24. Termination of an employee for the private use of alcohol or drugs while that employee was off duty and on personal time would also be a violation of the Collective Bargaining Agreement. David Hoffman, the business agent for Local 503 chapter of BCTGM International stated that on one previous occasion, an employee received a DWI when he was off duty and in his own vehicle and was allowed to return to work because he was not driving defendant's equipment and he was not on duty.
25. Katherine Calt and defendant-employer's field safety manager, Ronald King, testified that defendant-employer's practice is to terminate employees who test positive on a drug test. Defendant-employer's former employees Everly Felton, Timothy Cobb, and Gary Long suffered injuries on the job, submitted to post-accident drug tests, tested positive, and were terminated by defendant employer because of positive drug tests. Ms. Calt was unable to identify any employee who was terminated for a positive drug test other than a post-accident drug test. Ms. Calt was not aware of any employee who was terminated for the private use of alcohol or drugs while that employee was off duty.
26. The Full Commission gives greater weight to defendant-employer's written policies, the Collective Bargaining Agreement, and the testimony of David Hoffman than to the testimony of Katherine Calt and Ronald King regarding defendant-employer's practices.
27. At the time of plaintiff's termination, defendant-employer did not offer plaintiff the same assistance it had to other employees who requested counseling following a positive drug test, and defendant-employer did not allow plaintiff to continue working as it had to other employees who used alcohol or drugs while on their own time and were off duty and.
28. On October 25, 2006, plaintiff went to see his family physician, Dr. Samuel Wesonga at Boice-Willis Clinic. Plaintiff complained of headaches and back pain for the past *Page 10 
month. Plaintiff reported that he fell and hit his back and that he still had residual pain as a result of this incident. A physical examination of plaintiff revealed minimal lumbosacral spine tenderness, a negative straight leg raise, and normal range of motion. Dr. Wesonga referred plaintiff to physical therapy and prescribed Anaprox DS and Flexeril.
29. Plaintiff sought and eventually obtained employment approximately a month after his termination by defendant-employer. On November 6, 2006, plaintiff went to work for Kelly Services, Inc. as a production operator for Hospira. However, plaintiff earned substantially less while working for Kelly Services than he did when he was employed by defendant-employer.
30. As a production operator, plaintiff's job duties included keeping the production line running and inspecting IV bags. Although plaintiff and Hospira employee Eddie Wooten testified that plaintiff was not required to lift more than two to three pounds, the production operator position has a twenty-pound lifting requirement.
31. On November 13, 2006, plaintiff returned to Dr. Wesonga for a follow up visit. Plaintiff reported continued low back pain. The physical examination revealed minimal lumbosacral spinous tenderness. Dr. Wesonga again referred plaintiff to physical therapy.
32. On November 28, 2006, plaintiff began physical therapy at Boice-Willis Clinic. The initial evaluation notes indicate that on September 25, 2006, plaintiff fell backwards into a counter and twisted to the side. Plaintiff reported bilateral back pain, worse on right than the left. Plaintiff for the first time reported neck pain with one early episode of symptoms radiating down his right upper extremity. Plaintiff's symptoms were worse when sitting or standing and worse with various movements.
33. Plaintiff returned to physical therapy on December 1, 2006. At that time, plaintiff described occasional tingling in his right leg, mostly when sitting, and he felt like he could not *Page 11 
straighten his back when standing up from sitting. Plaintiff also reported sleep disturbances. Plaintiff did not return to physical therapy because he was unable to pay for the therapy.
34. Defendants denied the compensability of plaintiff's injury on November 29, 2006.
35. On March 22, 2007, plaintiff was seen by Hammer Chiropractic. Plaintiff complained of lower back pain with pain radiating into his right leg and knee. Plaintiff also reported cervical neck pain with headaches. The recorded history describes an injury on September 25, 2006 in which plaintiff fell backwards about five feet and hit a 2x4 board on the right side of his back. Plaintiff described that he fell backwards landing on his right hip/buttock snapping him back from his neck to his low back. Physical examination of the cervical, thoracic, and lumbar spine revealed reduced range of motion as well as tenderness and fixation along the C3-5, T4-7, L3-5, and right sacroiliac regions. Muscle spasms were also noted along the bilateral posterior cervical musculature, the bilateral levator scapula and trapezius musculature, and the bilateral erector spinae musculature.
36. Plaintiff received chiropractic treatment at Hammer Chiropractic on 26 occasions between March 22, 2007 and May 22, 2007, receiving chiropractic manipulation, physiotherapies, and therapeutic modalities including electric muscle stimulation, hot and cold packs, and traction. Significant findings and changes began with an unrelenting headache and neck and low back pain with radicular symptoms into the posterior bilateral legs and left groin. Between March 22, 2007 and April 4, 2007, plaintiff's symptoms did not abate to any significant degree. On April 5, 2007, plaintiff reported a decrease in groin pain, but when he brushed his teeth or washed his face over the sink he would have an increase in low back pain. Between April 9, 2007 and April 11, 2007, plaintiff experienced another dramatic increase in low back *Page 12 
pain and experienced corresponding bilateral radiculopathy which plaintiff reported on April 13, 2007. Plaintiff's cervical complaints diminished during this time, but did not resolve.
37. Tim D. Treanor, DC of Hammer Chiropratic ordered plaintiff out of work from April 13, 2007 through April 24, 2007. On April 18, 2007, it was reported that plaintiff's cervical pain was reducing somewhat. Between April 20, 2007 and May 2, 2007, plaintiff's headaches decreased; however, his pain in the middle and lower back regions continued. Between May 4, 2007 and May 18, 2007, plaintiff experienced increased low back pain and leg and groin paresthesia. No significant change or improvement was noted during plaintiff's final visit on May 22, 2007. Tim D. Treanor, DC ordered an MRI of plaintiff's cervical and lumbar spine and subsequently referred plaintiff to Dr. Raymond Baule for evaluation.
38. On May 31, 2007, plaintiff underwent MRI scans of his cervical and lumbar spine. The lumbar MRI revealed disc bulging with hypertrophy and moderate spinal stenosis at L2-3, disc bulging with hypertrophy and mild-moderate canal narrowing at L3-4, and disc bulging and mild neural foraminal narrowing with no nerve root impingement at L4-5. The cervical MRI revealed disc bulging with slight flattening of the anterior aspect of the thecal sac at C2-3, a broadbased bulge-herniation, moderate spinal stenosis and severe stenosis of the right neural foramen at C3-4, broadbased disc bulging with facet hypertrophy and moderate canal narrowing at C4-5, a central disc herniation with severe bilateral foraminal narrowing at C5-6, and disc bulging at C6-7.
39. Plaintiff was first seen by Dr. Raymond Baule, a neurosurgeon at Atlantic Neurosurgery Consultants, PA, on June 7, 2007. Plaintiff reported back pain and neck pain that began approximately nine months prior after a twisting type fall at work. Plaintiff complained of neck, upper extremity, low back, and lower extremity symptoms. Plaintiff described cervical *Page 13 
pain radiating into the right forearm and wrist with symptoms including numbness in the left thumb. He also described pain in the lower lumbar region with pain radiating into the groin bilaterally, both anterior thighs, and both lateral legs. Physical examination was without neurologic deficit. Dr. Baule reviewed the cervical MRI and lumbar MRI, which showed lumbar and cervical spinal stenosis. Dr. Baule diagnosed plaintiff with cervical and lumbar radiculopathy. He scheduled plaintiff for physical therapy and prescribed Naprelan and Robaxin. The medical records do not indicate that Dr. Baule gave plaintiff any work restrictions at this visit.
40. On September 3, 2007, in response to a letter written by plaintiff's attorney, Dr. Baule assigned plaintiff work restrictions of no lifting, pushing, or pulling over fifteen pounds.
41. As of September 18, 2007, plaintiff was not working at Hospira, and plaintiff was not on a Hospira assignment, pending an actual note from a doctor identifying his work restrictions. Kimberly Horne, Kelly Temporary Services on-site manager for Hospira, needed an actual note from the doctor as provided by Kelly Temporary Service's guidelines, and Ms. Horne instructed plaintiff that he would need to obtain a doctor's note indicating his restrictions. Once Ms. Horne received the work restrictions from the doctor, she would review the restrictions to determine whether plaintiff was able to return to work.
42. Plaintiff testified that he has not worked since September 18, 2007, because of his work restrictions. Plaintiff attempted to find other employment by contacting Kelly Services multiple times a week and looking through the paper for jobs. Plaintiff testified that he has not been able to find any jobs within his work restrictions. He also testified that he applied for a position with Convalance Plastics that would require lifting fifty to eighty pounds. *Page 14 
43. On September 18, 2007, Dr. Robert Elkins conducted a medical record review of medical records pertaining to plaintiff. In conducting his record review, Dr. Elkins did not review all of plaintiff's medical records. Moreover, Dr. Elkins' record review included another patient's medical records from Dr. Castiglia with the Buffalo Neurosurgery Group. Dr. Elkins never saw plaintiff for an evaluation. Based upon this record review, Dr. Elkins opined that plaintiff sustained a lumbar sprain on top of pre-existing degenerative changes in his lower spine as a result of the September 25, 2006, injury. Dr. Elkins also opined that plaintiff's neck complaints surfacing two months after an incident are probably not related to that incident. Dr. Elkins did not recommend any additional medical treatment and noted that he did not feel plaintiff had any permanent partial disability from his lumbar sprain. Dr. Elkins would not assign plaintiff any work restrictions from his lumbar strain, and he did not agree with the work restrictions that Dr. Baule assigned plaintiff.
44. Defendants admitted the compensability of the September 25, 2006 incident and plaintiff's lower back injury on September 24, 2007.
45. On October 17, 2007, Dr. Baule documented plaintiff's work restrictions in a note and backdated those restrictions to June 7, 2007.
46. On November 16, 2007, plaintiff returned to see Dr. Baule for a follow up visit. Plaintiff continued to report low back pain and right upper extremity pain, numbness, and tingling in a C6 distribution. Plaintiff also complained of left upper extremity numbness. Physical examination was without neurologic deficit. Dr. Baule noted that the lumbar MRI did not show significant contributing pathology for his symptoms, and that the cervical MRI showed disc bulges at C4-C5 and C5-C6. Dr. Baule diagnosed plaintiff with cervical disc bulges with *Page 15 
radiculopathy and lumbar stenosis/spondylosis. He ordered electrodiagnostic studies including an EMG/NCV of the upper extremities.
47. Dr. Baule's opinion is and the Full Commission finds as fact that plaintiff's cervical condition was caused or aggravated by the September 25, 2006 compensable injury.
48. Plaintiff's lumbar condition sustained as a result of the September 25, 2006 injury is radiculopathy as an exacerbation of pre-existing lumbar spondylosis.
49. As a result of the September 25, 2006, injury, plaintiff has been limited in his activities since the date of the injury and is restricted to no lifting, pushing, or pulling greater than fifteen pounds.
50. Dr. Baule recommended continued conservative treatment for both the cervical and lumbar conditions, which may include physical therapy, chiropractic treament, injection therapy, epidural steroid injection, activity modification, or bracing. With regard to the cervical spine, Dr. Baule may consider surgery if the cervical EMG demonstrated electrodiagnostic evidence of radiculopathy.
51. Given his treatment history with plaintiff, the opinions of Dr. Baule regarding diagnosis, causation, medical treatment, and plaintiff's ability to work are given greater weight than those of Dr. Elkins.
52. The greater weight of the credible evidence shows and the Full Commission finds that plaintiff's September 25, 2006 injury by accident caused his cervical condition.
53. At the time of the hearing before the deputy commissioner, plaintiff continued to experience pain and continued to need additional medical treatment.
54. Plaintiff has not reached maximum medical improvement. *Page 16 
55. Plaintiff's medical treatment related to his September 25, 2006 injury was reasonable and necessary to effect a cure and provide relief for plaintiff's cervical and lumbar conditions.
56. As the result of his September 25, 2006, injury by accident and related conditions, including his work restrictions, plaintiff was unable to earn wages in his former position with defendant-employer or in any other employment from September 27, 2006 through September 28, 2006, October 3, 2006 through November 5, 2006, April 13, 2007 through April 24, 2007, and September 19, 2007 through the present and ongoing. Plaintiff's injuries, pain, and work restrictions precluded him from continuing his regular job with defendant-employer, regardless of his termination.
57. Plaintiff's average weekly wage on the date of his injury was $533.72, leading to a workers' compensation rate of $355.83. Following a diligent job search, plaintiff found other employment from November 6, 2006 through September 18, 2007, at a significantly reduced wage. However, during this period, plaintiff was written out of work by Dr. Treanor from April 13, 2007 through April 24, 2007.
58. The greater weight of the evidence of record is that plaintiff did not constructively refuse suitable employment on October 2, 2006 when he tested positive for marijuana and cocaine. The test was administered two days after plaintiff's injury, which was not consistent with defendant-employer's policy, and plaintiff had not reported for work or worked on September 27, 2006 prior to the test. Therefore, the positive drug test results were not indicative of drug use or intoxication when reporting for work or while on the job. No evidence was presented that plaintiff ever reported for or attended work while intoxicated or under the influence of drugs. Defendants failed to show, by the greater weight of the evidence, that *Page 17 
plaintiff was terminated for misconduct or fault unrelated to his compensable injury for which a non-disabled employee would ordinarily have been terminated by defendant-employer.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's cervical and back conditions are a result of plaintiff's compensable injury by accident on September 25, 2006. N.C. Gen. Stat. § 97-2(6); Booker v. Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979).
2. Plaintiff is entitled to have his previous and ongoing medial treatment paid for by defendants, which is related to his injury by accident and is reasonably necessary to effect a cure or provide relief. N.C. Gen. Stat. §§ 97-2(19); 97-25.
3. Dr. Raymond Baule is approved to assume plaintiff's care. Plaintiff is entitled to have defendant pay for further evaluation and treatment by Dr. Baule as may be reasonably required to effect a cure or give relief from the effects of plaintiff's injury by accident. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
4. An employee may meet the initial burden of proving disability by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes *Page 18 Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). As a result of plaintiff's injury by accident, plaintiff was unable to earn wages from September 27, 2006 through September 28, 2006, October 3, 2006 through November 5, 2006, April 13, 2007 through April 24, 2007, and September 19, 2007 through the present and ongoing. Plaintiff was only able to earn partial wages from November 6, 2006 through April 12, 2007 and April 25, 2007 through September 18, 2007. Id.; N.C. Gen. Stat. §§ 97-29 and 97-30.
5. Defendants have failed to show that plaintiff was terminated for misconduct or other fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily be terminated.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 234,472 S.E.2d 397, 401 (1996). Therefore, plaintiff did not constructively refuse suitable employment when he tested positive for cocaine and marijuana. N.C. Gen. Stat. § 97-32.
6. As a result of his compensable injury by accident, plaintiff is entitled to temporary total disability compensation at the rate of $355.83 for the period from September 27, 2006 through September 28, 2006, October 3, 2006 through November 5, 2006, April 13, 2007 through April 24, 2007, and September 19, 2007, through the present and ongoing or until further order of the Commission.
7. As a result of his compensable injury by accident, plaintiff is entitled to temporary partial disability compensation for wage loss from November 6, 2006 through April 12, 2007 and from April 25, 2007 through September 18, 2007 pursuant to N.C. Gen. Stat. § 97-30.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following: *Page 19 
 AWARD
1. Subject to a reasonable attorney's fee approved herein, defendants shall pay to plaintiff temporary total disability compensation at the rate of $355.83 per week from September 27, 2006 through September 28, 2006, October 3, 2006 through November 5, 2006, April 13, 2007 through April 24, 2007, and September 19, 2007 through the present and ongoing or until further order of the Commission. Portions of this compensation have accrued and shall be paid in a lump sum.
2. Subject to a reasonable attorney's fee approved herein, defendants shall pay to plaintiff temporary partial disability compensation from November 6, 2006 through April 12, 2007 and from April 25, 2007 through September 18, 2007. This compensation shall be paid in a lump sum.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraphs 1 and 2 above is hereby approved to be deducted from the amounts due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay for all reasonably related medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury.
5. Dr. Raymond Baule is approved to assume plaintiff's care consistent with the Industrial Commission's Rules. Defendants shall continue to provide plaintiff with necessary medical compensation to effect a cure or give relief.
6. Defendants shall pay the costs, including expert witness fees of $675.00 to Dr. Baule and $575.00 to Dr. Elkins.
This the 13th day of April 2009. *Page 20 
S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1